# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>v.<br><br>MARCUS ALLEN MCGUIRE,<br><br>                Defendant. | **MEMORANDUM DECISION AND ORDER DENYING [15] DEFENDANT'S MOTION TO SUPPRESS**<br><br>Case No. 2:18-CR-00216-DN<br><br>District Judge David Nuffer |

      Marcus Allen McGuire moves to suppress evidence obtained during a warrantless probation compliance search. During the search, a Sig Sauer .45 caliber pistol was discovered which was used in charging Mr. McGuire with the crime of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).[1] Mr. McGuire contends that: 1) the warrantless search was illegal under the Fourth Amendment of the United States Constitution;[2] 2) that he was illegally seized in contravention of the Fourth Amendment;[3] and post-search and seizure statements taken from the Defendant are the fruits of that alleged illegal search and seizure.[4]

      The issues in the case arise because the probation search was directed at Nicholas Erickson who was on probation with the State of Utah. The evidence at issue was in a backpack

---

[1] Indictment, docket no. 1, filed April 19, 2018.

[2] Defendant's Motion to Suppress, docket no. 15, filed June 11, 2018. It should be noted that Defendant's motion erroneously lists December 21, 2017, as the date of the contested search. *Id.* The correct date for the incident is March 13, 2018. Transcript 22:6–7

[3] Defendant's Proposed Order Granting Motion to Suppress, docket no. 27, filed August 24, 2018. (Defendant did not raise this specific argument in the motion to suppress, instead raising it for the first time in the propose order following the hearing on the motion to suppress. This new argument was heard at the follow up hearing held on September 17, 2018 *See* Minute Entry for Proceedings Held Before Judge David Nuffer, docket no. 31, filed September 17, 2018.).

[4] Defendant's Motion to Suppress, docket no. 15, filed June 11, 2018; Defendant's Proposed Order Granting Motion to Suppress, docket no. 27, filed August 24, 2018 (Again, the seizure argument and suppression of post-seizure statements was first raised in this proposed order.).

in a bedroom in which McGuire was staying at Erickson's residence in Salt Lake City, Utah.[5]

The bedroom was that of Mr. Erickson's seven-year-old daughter, though she was not present

and the bedroom was occupied the night of the probation search by McGuire and two other

adults.

        This order DENIES the motion to suppress.

RELEVANT FINDINGS OF FACT ........................................................................................ 2
CONCLUSIONS OF LAW ................................................................................................ 12
    1. The Search Did Not Violate the Fourth Amendment Because the Special Needs
        Exception to the Warrant Requirement Applied................................................ 12
        A.     Agent Combs Had Reasonable Suspicion to Search the Room and the
             Backpack........................................................................................... 15
        B.     The Search was Reasonably Related to Agent Combs's Duties............... 18
    2.     Mr. McGuire Was Not Illegally Seized in Violation of the Fourth Amendment . 20
    3. Defendant's Statements Cannot Be Suppressed Because the Search Was Reasonable
        Under the Fourth Amendment and Because Defendant Was Not Illegally Seized
        ........................................................................................................................ 22
ORDER ......................................................................................................................... 23

**RELEVANT FINDINGS OF FACT**

    1.      Nicholas Erickson was under a probationary requirement to submit to search of

his premises and also a requirement that he not possess a firearm.[6]

    2.      On March 13, 2018, the on-call supervisory agent for AP&P, Mr. Kiley Willis,[7]

received a call from Salt Lake City Police dispatch regarding Mr. Erickson stating that he had a

firearm, was about the age of 36 years, and lived at 836 West Genesee Avenue.[8]

---

[5] Defendant's Motion to Suppress, docket no. 15, filed June 11, 2018.

[6] Transcript 23:17–19; 131:18–20; Government Exhibit 12.

[7] Supervisory Agent Kiley Willis is an 18-year law enforcement veteran. He spent one year with the Salt Lake County Sheriff before moving the Department of Corrections, where he has been for the past 17 years. He has been with Utah State Adult Probation and Parole for ten years (including two years as a supervisor). He has been with Utah State Adult Probation and Parole for ten years (including two years as a supervisor). Transcript 9:5–20.

[8] Transcript 9:5–6; 11:5–6; 131:20–25, 132:1–3; Government Exhibit 16.

3. The call from dispatch relayed the location of the firearm as in Mr. Erickson's daughter's bedroom, the room downstairs to the left in the home.[9]

4. Mrs. Catherine Erickson speculated that the tip from dispatch likely originated from Mr. Erickson's girlfriend Ginger, who was there on a night before March 13th and was "very angry, very angry," according to Mr. Erickson, about a gun.[10]

5. Mrs. Erickson said that Mr. Erickson told her about the gun on the day Ginger left angry and "[Ginger] knew about the gun and she was the only one that could have called [Mr. Erickson's] [probation officer] and told him."[11]

6. When Supervisory Agent Willis gets any call about a probationer, he looks into whether the individual is supervised, what they're being supervised for, where they live, and what is presently going on before he does anything.[12]

7. Supervisory Agent Willis then contacted Adult Probation and Parole ("AP&P") Agent Stuart Combs[13] and gave him the specific information regarding the location of the firearm and the probationer involved: that the firearm could be found in Mr. Erickson's daughter's room, in the downstairs of the residence.[14]

8. Supervisory Agent Willis asked Agent Combs to go to the residence and conduct a probation search.[15]

---

[9] Transcript 14:19–23; 132:9–12; Government Exhibit 16.

[10] Transcript 111:24–25; 112:1–5; 123:5–6; 132:4–8.

[11] Transcript 112:20–25; 113:1–3.

[12] Transcript 12: 9–17.

[13] Agent Stuart Combs has spent three years as an Agent with Utah State Adult Probation and Parole. He supervises a gang probation caseload and is a task force officer with the Metro Gang Unit. Transcript 19:15–25; 20:1–14.

[14] Transcript 14:17–23; 15: 21–25; 16:1–2; 24:2–9; 132:14–17.

[15] Transcript 14:20–21.

9.     It was discovered that the address given to dispatch by the person calling with the tip was two digits off; it was actually 838 and not 836.[16]

10.     Agent Combs is experienced in probation searches, attached to the gang unit, and was sent to the location because the tip alleged that Mr. Erickson had a firearm.[17]

11.     That night, Agent Combs was wearing a uniform identifying him as a police officer, including an embroidered badge on his external carrier with a placard with a flag and "POLICE" underneath it; an actual metal badge on his drop leg holster; and the back of his jacket had "Police Metro Gang Unit."[18]

12.     After receiving the call from Supervisory Agent Willis, Agent Combs checked F-track[19] and learned that Mr. Erickson was on probation for a weapons offense and verified where Mr. Erickson lived.[20]

13.     Agent Combs then went to Mr. Erickson's home with three other metro gang unit officers: Detective Cody Pender, Sergeant Scott Hansen, and Detective Jerry Valdez, who are all affiliated with Salt Lake Unified Police Department.[21]

14.     The officers arrived at the home around 10:30 p.m.[22]

15.     The home is a single-family ranch rambler with a main floor with stairs to a basement.[23]

---

[16] Transcript 16:9–10; 132:19–21.

[17] Transcript 13:16–21; 132:25, 133:1–4.

[18] Transcript 42:16–25; 43:1–7.

[19] F-track is an offender tracking system used by AP&P to obtain information on probationer/parolees; their crimes; criminal history; addresses; etc. Transcript 23:14–20.

[20] Transcript 22:21–25; 23: 1–8, 14–20; 24:2–9; 133:4–8.

[21] Transcript 24:11–24; 133:12–14.

[22] Transcript 25:13–15; 133:15–16.

[23] Transcript 25:5–12.

16.     Agent Combs went to the door and a man he believed to be Mr. Erickson's father answered.[24]

17.     The officers were invited into the home.[25]

18.     Agent Combs also saw a female aged about 50 or 60 and a few little kids.[26]

19.     Agent Combs stated that he was there to see Mr. Erickson, who then came upstairs approximately 30-45 seconds later.[27]

20.     Agent Combs told Mr. Erickson that he was with AP&P and was there to do a compliance check (also known as a home visit).[28]

21.     All four officers went downstairs with Mr. Erickson.[29]

22.     According to Agent Combs, there were three bedrooms and a family room in the basement.[30]

23.     Agent Combs and Sergeant Hansen went into Mr. Erickson's bedroom.[31]

24.     Upon searching Mr. Erickson's bedroom, Agent Combs found, in plain-view, a knife on the floor at the foot of Mr. Erickson's bed.[32]

25.     While being questioned by Sergeant Hansen, Mr. Erickson denied gang involvement, but said that he was a tagger and used the name "Hyst."[33]

---

[24] Transcript 25:16–22; 133:16–17.

[25] Transcript 25:23–24.

[26] Transcript 26:12–25; 27:1–2; 133:17–19.

[27] Transcript 25:20–22; 27:3–5.

[28] Transcript 27:13–17; 30:2–3.

[29] Transcript 85:3–5.

[30] Transcript 28:3–9; 99:13–15; 133:22–25.

[31] Transcript 27:14–17.

[32] Transcript 28:16–17; 29:11–13, 22–24; 134:6–16; Government Exhibits 7 & 8.

[33] Transcript 31:4–7; 134:19–21.

26. The knife was a probation violation and raised Agent Combs' suspicions that there might be other violations, including gun possession.[34]

27. Agent Combs then asked Mr. Erickson if he could search Mr. Erickson 's daughter's bedroom and Mr. Erickson replied, "Yes."[35]

28. Section six of Mr. Erickson's Probation Agreement[36] permits AP&P agents to search, among other things, the residence of probationers.[37] Specifically, the probation agreement allows probation agents to search areas that belong to the probationer, areas that the probationer has access to, and common areas, kitchens, and living rooms.[38]

29. Agent Combs believed that he could search Mr. Erickson's daughter's bedroom under the terms of the probation agreement, but he asked Mr. Erickson about searching just to get Mr. Erickson's permission as that was Agent Combs' standard practice.[39]

30. Before Agent Combs went into Mr. Erickson's daughter's room, Mr. Erickson did not say anything about what Agent Combs might see in that room or whether anyone was in the room.[40]

31. Agent Combs went to the daughter's bedroom, opened the closed door, turned on the light, and was surprised to find three people sleeping there, who were later identified as Tiffany (last name unknown), Defendant (Marcus McGuire), and George (a/k/a Mad Dog).[41]

---

[34] Transcript 31:17–20; 134:21–23.

[35] Transcript 31:22–25; 32:41; 34:23–25.

[36] Government Exhibit 12.

[37] Transcript 35:9–14; 135:1–3; Government Exhibit 12.

[38] Transcript 32:10–14; 35:9–14; Government Exhibit 12.

[39] Transcript 36:12–21.

[40] Transcript 37:7–11.

[41] Transcript 37:15–23; 135:3–10.

32.     When Agent Combs turned on the light, it roused Defendant, Tiffany, and George.[42]

33.     Agent Combs did not identify himself, but asked the three to step out of the room for a minute because he needed to search the room.[43]

34.     All three individuals were fully clothed, but were sleeping in the room.[44]

35.     Agent Combs believed Defendant was also wearing shoes at this time.[45]

36.     All three people were calm and complied with Agent Combs' request to leave the bedroom.[46]

37.     None of the three asked to take anything with them as they left.[47]

38.     Agent Combs did not order them not to touch or take anything with them.[48]

39.     Officer Combs did not ask anyone if they had any property there or if they wanted to take any property with them.[49]

40.     After Defendant, Tiffany, and George exited the bedroom, Detective Valdez remained with them from that point on.[50]

41.     The bedroom appeared to be 8 x 6-10 feet[51] and was very messy with clothes strewn all over and garbage scattered within.[52]

---

[42] Transcript 42:7–10.

[43] Transcript 42:7–12.

[44] Transcript 93:10–22; 135:10–11.

[45] Transcript 93:13–22.

[46] Transcript 42:6; 43:11–18.

[47] Transcript 136:9–11.

[48] Transcript 61:10–12.

[49] Transcript 66:10–15.

[50] Transcript 44:10–11.

[51] Transcript 38:5–6.

[52] Transcript 38:10–16.

42.     There was a twin mattress without a bed frame on the ground, a few pillows, blankets, and a small amount of furniture in the room.[53]

43.     There were not any sleeping bags in the room.[54]

44.     Agent Combs stated that there was "no real way to know which item in the room was [Mr. McGuire's] and which one was not."[55]

45.     Agent Combs did a cursory search of most of the room, and found a backpack by the closet.[56]

46.     The backpack was a drawstring backpack; the drawstring was not tightened but the backpack's flap was draped over the top of the pack with none of the flap's latches secured or cinched down.[57]

47.     Before searching it, Agent Combs did not ask any of the individuals who had been sleeping in the room if it was their backpack.[58]

48.     Because the flap's latches were not secured on the bag, Agent Combs could see the cover of a blue notebook inside.[59]

49.     When Officer Combs lifted the bag's flap, he saw the blue notebook was tagged with graffiti and this strongly suggested to Agent Combs that it might be Mr. Erickson's bag because he talked about being a "tagger."[60]

---

[53] Transcript 38:13–14; 41:14–17, 19, 20–21; 135:20–21; Government Exhibit 1.

[54] Transcript 41:22–23.

[55] Transcript 81:18–20.

[56] Transcript 45:10–17; 46:1–5; 138:24–25, 139:1–5; Government Exhibit 1.

[57] *Id.*

[58] Transcript 72:14–16.

[59] Transcript 46:3–8; 139:2–5; Government Exhibits 1 & 10.

[60] Transcript 46:9–16; 139:22–25, 140:1; Government Exhibit 10.

50.     Officer Combs removed the notebook, opened or flipped the notebook over, and saw on the back cover more graffiti writing with the word "HYST" and some other writing.[61]

51.     Because Mr. Erickson had admitted to Agent Combs that he was a tagger, Agent Combs continued to think that the notebook and the backpack likely belonged to Mr. Erickson.[62]

52.     Agent Combs continued searching in the backpack and found a white plastic bag (like a kitchen garbage can liner, that was not tied, but the top had been wrapped).[63]

53.     Agent Combs pulled out the plastic bag and by holding/handling it (and based upon his experience) and it appeared to contain a gun.[64]

54.     Agent Combs removed the gun[65] out of the plastic bag.[66]

55.     The firearm was a Sig Sauer .45 caliber pistol.[67]  There was a magazine in the pistol which contained rounds of .45 caliber ammunition.[68]

56.     At this point, Agent Combs believed the gun belonged to Mr. Erickson because of the information from his AP&P supervisor; where the weapon was found; and the graffiti (including the HYST name) on the notebook.[69]

---

[61] Transcript 46:20–22; 47:1–2; Government Exhibit 11.

[62] Transcript 46:12–16.

[63] Transcript 49:21–25; 140:5–7.

[64] Transcript 50:5–17; 140:8–9; Government Exhibit 2.

[65] Government Exhibit 3.

[66] Transcript 126:11–13; 140:12–16.

[67] Transcript 51:2–19.

[68] Transcript 51:22–25; Government Exhibits 4 & 6.

[69] Transcript 52:20–25, 53:1.

57.     Agent Combs continued to search the backpack and he found a temporary Utah ID (which had been issued the day before (March 12, 2018)) issued to Mr. McGuire, and a piece of mail addressed to Mr. McGuire.[70]

58.     The temporary ID had the Genesee street address on it.[71]

59.     Officer Combs was not sure of the address on the mail.[72]

60.     At the time of the backpack search, there was no one in the room to claim or disclaim ownership of the bag or any items found in it.[73]

61.     However, after finding these items, Officer Combs began to think the firearm belonged to Mr. McGuire.[74]

62.     As Agent Combs was performing the search of the bedroom, Mr. McGuire, Tiffany, and George remained with Detective Valdez.[75]

63.     At this point in time Mr. Erickson remained in his bedroom with Sergeant Hansen.[76]

64.     Mr. McGuire, Tiffany, and George wanted to go upstairs and outside to smoke.[77]

65.     Detective Valdez took them upstairs and outside.[78]

---

[70] Transcript 53:8–11; 54:5–18; 56:4–14; 140:9–10, 16–19; Government Exhibit 9.

[71] Transcript 54:5–18; 140:16–21; Government Exhibit 9.

[72] Transcript 54:23–25; 140:18–20.

[73] Transcript 142:1–4.

[74] Transcript 57:13–16.

[75] Transcript 94:13–15.

[76] Transcript 44:8–9; 76:21–23; 78:2–3.

[77] Transcript 85:6–7.

[78] Transcript 85:7–11.

66.     Mr. McGuire did ask Detective Valdez what was going on and he was told in response that it was an AP&P search.[79]

67.     Mr. McGuire asked Valdez if he was detained, and Valdez said "yeah just while they conduct an investigation."[80]

68.     By using the word "detained," Detective Valdez testified that he was letting everyone, not just Mr. McGuire, know they were detained.[81]

69.     Detective Valdez also engaged in small talk with Mr. McGuire and remembered that "Mr. McGuire and his girlfriend just arrived in Utah, they weren't actually staying at the house (on Genesee Avenue) but that they were just visiting. Kind of passing through."[82]

70.     Detective Valdez also stated that Mr. McGuire did not ask to go back into the house or obtain any possessions, but he did ask or was told that he was detained until the search was completed.[83]

71.     After finding the gun, Agent Combs had Sergeant Hansen put Mr. Erickson in handcuffs and Agent Combs interviewed Mr. Erickson about the firearm.[84]

72.      Sergeant Hansen and Detective Pender were present for this interview.[85]

73.     During the interview, Mr. Erickson referred only to the female individual by name[86] and that he did not know the others, referring to Mr. McGuire and the George.[87]

---

[79] Transcript 139:15–17.

[80] Transcript 87:13–14; 91:10–15.

[81] Transcript 94:12–15.

[82] Transcript 86:5–13; 88:8–11.

[83] Transcript 138:20–23.

[84] Transcript 142:5–8; Government Exhibit 14.

[85] Transcript 57:22–25; 58:1–6; 59:1.

[86] Transcript 59:20–23.

[87] Transcript 60:2–6.

74.     Officer Combs then met with Mr. McGuire in the driveway and advised him of his constitutional rights per *Miranda* which he waived.[88]

75.      In the audio recording of the interview, Mr. McGuire admitted that he knew Mr. Erickson through his fiancée and that they had just gotten in.[89]

76.     Mr. McGuire also stated that his uncle gifted him the gun and that he was trying to find someone responsible to give it to or sell it to.[90]

77.     Mr. McGuire admitted that he had previously been convicted of a felony prior to March 13, 2018.[91]

78.     Mr. Erickson was placed into custody and went to jail on a 72-hour hold.[92]

79.     Mr. McGuire, Tiffany, and George were released on the scene while they were still in the driveway.[93]

80.     The knife, gun, and ID were taken as evidence, but the backpack and mail were not seized.[94]

## CONCLUSIONS OF LAW

### 1. The Search Did Not Violate the Fourth Amendment Because the Special Needs Exception to the Warrant Requirement Applied

The search of Mr. Erickson's seven-year-old daughter's bedroom, including the search of the backpack found in it, did not violate the Fourth Amendment because the special needs exception to the warrant requirement applied. The Tenth Circuit Court of Appeals recognizes

---

[88] Transcript 142:15–16; Government Exhibit 15.

[89] Transcript 63:16–25.

[90] Transcript 142:19–22.

[91] Transcript 131:15–16.

[92] Transcript 143:6–7.

[93] Transcript 143:7–9.

[94] Transcript 143:9–11.

that "[t]he touchstone of the Fourth Amendment is reasonableness."[95] "Ordinarily, a search of a home is reasonable only if it is authorized by a judicial warrant, which must be supported by probable cause."[96]

But the United States Supreme Court has determined that, when searching the home of a probationer, "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable."[97] This is because "probationers . . . do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special probation restrictions."[98] "These restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large."[99] These goals "require and justify the exercise of supervision to assure that the restrictions are in fact observed."[100] Supervision of probationers is therefore "a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large."[101]

A search which is carried out under the direction of probation officers meets the special needs exception, therefore complying with the Fourth Amendment, if it is conducted pursuant to state law that satisfies the reasonableness requirement and where: (1) the probation officer has a reasonable suspicion that the probationer has committed a probation violation or crime; and (2)

---

[95] *United States v. Carter*, 511 F.3d 1264, 1267 (10th Cir. 2008).

[96] *United States v. Warren*, 566 F.3d 1211, 1214 (10th Cir. 2009) (citing *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)).

[97] *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987).

[98] *Id*. at 874.

[99] *Id.* at 875.

[100] *Id.*

[101] *Id.*

the search is reasonably related to the probation officer's duties.[102] Such a search is proper even when police officers participate in the search, as long as they are acting under the direction of the parole officer.[103]

Here, it is uncontested that on March 13, 2018, Mr. Erickson resided at 838 West Genesee Avenue, Salt Lake City, Utah.[104] Furthermore, it is uncontested that on March 13, 2018, Mr. Erickson was on Utah State Probation for a felony offense and, that on April 5, 2017, he had signed a Probation Agreement with the State of Utah, Department of Corrections. In section 4, the Probation Agreement directed him not to "own, possess, have under [his] control, in [his] custody or on his premises where [he] reside[s]: any explosives, firearms, archery equipment or crossbows, or any dangerous weapons." In section 6 it required him to "[p]ermit officers of Adult Probation and Parole to search [his] person, residence, vehicle or any other property under [his] control without a warrant at any time, day or night, upon reasonable suspicion to ensure compliance with the conditions of the Probation Agreement."[105]

Because the Tenth Circuit has determined that warrantless searches properly conducted by Utah State probation officers satisfy the reasonableness inquiry,[106] the determinative questions here are whether Agent Combs had reasonable suspicion to search the room—and the bag found in it—and whether the search was reasonably related to Agent Comb's duties as a probation officer.

---

[102] *United States v. Stewart,* 273 Fed.Appx 768 (10th Cir. 2008) (citing *Carter,* 511 F.3d at 1268; *United States v. Lewis,* 71 F.3d 358, 362 (10th Cir. 1995); *State v. Johnson,* 748 P.2d 1069, 1072–73 (Utah 1987)).

[103] *United States v. Freeman,* 479 F.3d 743, 748 (10th Cir. 2007) (the special needs exception does not extend to other law enforcement officers "unless they are acting under the direction of the parole officer.").

[104] Transcript 22:12–13, 16–18, 21–25; 23:1–2, 7–8,14–20; 98:23–24;

[105] Government Exhibit 12

[106] *Stewart,* 273 Fed. Appx at 768; *Carter,* 511 F.3d at 1268.

A. **Agent Combs Had Reasonable Suspicion to Search the Room and the Backpack**

In order to search the home of probationer, a probation officer should have a "reasonable cause to believe" that the search would reveal "evidence of either a crime or a probation violation."[107] "Reasonable suspicion is a less demanding standard than probable cause."[108] "To determine whether the investigating officers had reasonable suspicion, [a court] considers both the quantity of the information possessed by law enforcement and its reliability."[109] Pursuant to Utah law, reasonable suspicion may exist where the probation officer's "suspicion is based only on a tip by an anonymous informer, the police, or other sources."[110] The Tenth Circuit, relying on precedent established in the Ninth Circuit, has recognized that particular *items* can be searched, provided that probation officers have "reasonable suspicion [] that an item to be searched is owned, controlled, or possessed by probationer, in order for the item to fall within the permissible bounds of a probation search."[111]

The facts establish that AP&P clearly had sufficient evidence to support a reasonable suspicion that Mr. Erickson was in violation of his probation agreement for multiple reasons at the time of the search. That reasonable suspicion permitted Agent Combs to search rooms within Mr. Erickson's residence.

On March 13, 2018, Agent Combs had been informed by his supervisor, Supervisory Agent Willis, that Willis had received a call from Salt Lake City Police dispatch informing him that Mr. Erickson, a probationer, had a firearm and the firearm could be found in Mr. Erickson's

---

[107] *Stewart*, 273 F.Appx at 770.

[108] *United States v. Treto–Haro*, 287 F.3d 1000, 1004 (10th Cir. 2002).

[109] *Id*.

[110] *State v. Martinez*, 811 P.2d 205, 209 (Utah App. 1991).

[111] *United States v. Cannon*, No. 93-1377, 1994 WL 637078, at *2 (10th Cir. 1994) (quoting *United States v. Davis*, 932 F.2d 752, 758 (9th Cir.1991)).

daughter's bedroom which was in the downstairs of Mr. Erickson's residence.[112] Agent Combs verified Mr. Erickson's probation status, his address, his criminal history, that he had a probation agreement, and that his probation was for a weapons offense.[113] Agent Combs knew that as a probationer, Mr. Erickson was not allowed to possess weapons.[114] Agent Combs and other law enforcement officers went to visit Mr. Erickson at his residence.[115]

Upon arrival at Mr. Erickson's residence (at approximately 10:30 p.m.), Agent Combs and the other officers were invited into the home and Mr. Erickson came up to meet with them near the door.[116] Agent Comb identified himself with AP&P and informed Mr. Erickson that he was there to do a "compliance check."[117] Mr. Erickson said, "Okay," and took Agent Combs and Sgt. Hansen down to his room.[118] As they walked into Mr. Erickson's bedroom, the first thing Agent Combs saw was a knife on the ground at the foot of Mr. Erickson's bed.[119]

Possessing the knife was a violation of Mr. Erickson's probation and led Agent Combs to believe there may be other violations, including—based on the tip—that Mr. Erickson was in the possession of a firearm and that the firearm was located in his daughter's bedroom.[120] Although the terms of the Probation agreement[121] permitted Agent Combs to search Mr. Erickson's daughter's bedroom—a room under Mr. Erickson's control—Agent Combs obtained Mr.

---

[112] Transcript 22:21–25; 23:1–2, 21–25; 24:1–5. Government Exhibit 16.

[113] Transcript 23:14–20; 31:1–2.

[114] Government Exhibit 12.

[115] Transcript 24:10–24.

[116] Transcript 25:13–15; 27:6–7

[117] Transcript 27:13–14

[118] Transcript 27:14–16

[119] Transcript 27:16–20; 28–29; Government Exhibits 7 & 8

[120] Transcript 31:17–20

[121] Transcript 32:10–14; 35:9–14; Government Exhibit 12.

Erickson's permission to search the bedroom[122] and proceeded with search still premised on appropriate, reasonable suspicion.

As to the backpack found in the bedroom, Agent Combs had reasonable suspicion to search it for evidence of a probation violation because Agent Combs suspected the backpack was owned, controlled, or possessed by Mr. Erickson. The backpack was located by the closet in a very messy bedroom under the control of Mr. Erickson.[123] The backpack had nothing on it to indicate who owned it.[124] No one in the room claimed the backpack to be theirs or asked to take anything from the room after Agent Combs informed them that he was there to do a search and asked them to leave.[125]

The backpack was not cinched shut and top flap of the backpack was flipped over the top but not latched shut or secured.[126] When Agent Combs discovered the backpack, he could see a blue notebook at the top of the backpack.[127] Agent Combs pulled the top flap of the backpack and saw that the blue notebook contained graffiti-type writing on the cover strongly suggesting that it might be Mr. Erickson's bag because he claimed to be a tagger.[128] Agent Combs flipped the notebook over and saw on the back cover more graffiti writing with the work "HYST" which was Mr. Erickson's tagger name and this only strengthened his belief that the bag was Mr. Erickson's.[129]

---

[122] Transcript 36:12–21.

[123] Transcript 38:10–16; 45:10–17; 46:1–5; 138:24–25; 139:1–5; Government Exhibit 1

[124] Government Exhibit 1

[125] Transcript 42:7–10; 136:9–11

[126] Transcript 38:10–16; 45:10–17; 46:1–5; 138:24–25; 139:1–5; Government Exhibit 1

[127] Transcript 45:14–17; 69:13–15

[128] Transcript 49:9–16; 139:22–25; 140:1; Government Exhibit 10

[129] Transcript 46:20–22; 47:1–2; Government Exhibit 11

Agent Combs found the gun in the backpack next, and again, based on the presence of the notebook in the backpack, Agent Combs speculated that the gun might belong to Mr. Erickson.[130] It was only after the subsequent discovery the temporary identification card and a piece of mail addressed to Mr. McGuire in the backpack[131] that Agent Combs began to think that the gun might belong to Mr. McGuire.[132]

However, this belated discovery of evidence of McGuire's ownership *does not* render the search illegal. The search of backpack commenced with the appropriate, reasonable suspicion that Mr. Erickson had violated the terms of his probation agreement by possessing a firearm; that the firearm was located in his daughter's bedroom; that this particular backpack belonged to him; and that a search of the backpack might reveal evidence that Mr. Erickson violated his agreement. Having concluded that Agent Combs had reasonable suspicion to search these rooms and this particular item, the analysis now turns to whether the search was reasonably related to Agent Combs's duties.

B. **The Search was Reasonably Related to Agent Combs's Duties**

For a warrantless probation search to be reasonable under the Fourth Amendment, the search must also be reasonably related to the probation officer's duties.[133] The facts show that Agent Combs was employed as an AP&P agent and, in addition to his supervision caseload, is a task force officer with the metro gang unit.[134] The search was conducted at the direction of Combs's immediate AP&P supervisor, who had received a dispatch call that a probationer, Mr.

---

[130] Transcript 52:20–25, 53:1.

[131] Transcript 53:8–11; 54:5–18; 56:4–14; 140:9–10, 16–19; Government Exhibit 9.

[132] Transcript 57:13–16.

[133] *Stewart*, 273 F.App'x at 770.

[134] Transcript 19:15–25; 20:1–2

Erickson, had a firearm and it was located in his daughter's downstairs bedroom.[135] Concerned about possible probation violations, Agent Combs went to investigate the complaint and check on Mr. Erickson.

The search of Mr. Erickson's residence, including the backpack located in Mr. Erickson's daughter's bedroom, was reasonably related to Agent Combs' responsibilities as an AP&P agent. The search was performed based on Agent Combs' legitimate concerns relating to Mr. Erickson's noncompliance with the terms of his probation agreement.[136] Agent Combs directed the search and that the other law enforcement officers present acted under Agent Combs' direction.[137] Agent Combs had authority under Mr. Erickson's probation agreement[138] to search Mr. Erickson's seven-year-old daughter's bedroom because it is part of his residence and as a parent he would certainly have control over his minor child's bedroom within his residence. This authority extended to the backpack found in that room, particularly since Agent Combs suspected that the backpack might belong to Mr. Erickson.[139]

Agent Combs had reasonable suspicion to search Mr. Erickson's daughter's bedroom and the backpack found in it and the search was reasonably related to his duties as a probation officer. The warrantless probation compliance search therefore fully complied with the requirements of the special needs exception and was reasonable under the Fourth Amendment.

---

[135] Transcript 22:21–25

[136] *See Stewart*, 273 Fed. Appx at 770; *Lewis*, 71 F.3d at 363 ("To adequately deter misconduct and protect the public, [probation] agents must be permitted to act expeditiously upon reasonable suspicion of a [probation] violation.").

[137] *Freeman*, 479 F.3d at 748.

[138] Transcript 32:10–14; 35:9–14; Government Exhibit 12.

[139] Transcript 49:9–16; 139:22–25; 140:1.

## 2.  **Mr. McGuire Was Not Illegally Seized in Violation of the Fourth Amendment**

Defendant also argues that, "[he] was seized the moment when his encounter with law enforcement began[,]"[140] and that the seizure was unlawful because the law enforcement officers "did not have reasonable suspicion to effect a warrantless seizure of Mr. McGuire."[141] Although Mr. McGuire was detained, that detention was lawful.

The United States Supreme Court long ago determined that "[w]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures."[142] In *Michigan v. Summers*,[143] the Supreme Court held that "some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less the probable cause, so long as police have an articulable basis for suspecting criminal activity."[144] These "substantial law enforcement interests" that justify dentition include preventing flight (should the officers find incriminating evidence), minimizing the risk of harm to the officers, and facilitating the orderly completion of the search.[145]

The rule in *Summers* was extended further by the Supreme Court in *Muehler v. Mena*,[146] when the Supreme Court held that *Summers* permitted law enforcement officers executing a search warrant to detain individuals even when the officers have no particular suspicion that an

---

[140] Defendant's Proposed Order Granting Motion to Suppress, docket no. 27 at 21, filed August 24, 2018.

[141] *Id.* at 23.

[142] *Elkins v. United States*, 364 U.S. 206, 222 (1960).

[143] 452 U.S. 692 (1981).

[144] *Id.* at 699.

[145] *Id.* at 702–703.

[146] 544 U.S. 93 (2005).

individual is involved in criminal activity or poses a specific danger to the officers.[147] The Supreme Court also clarified that "[a]n officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'"[148] The rule announced in *Summers* allows detention incident to the execution of a search warrant "because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial."[149]

Although the Tenth Circuit has yet to address whether *Summers* and *Muehler* extend to the detention of occupants during the warrantless search of a probationer's home, the Ninth Circuit has chosen to do so. In *Sanchez v. Caneles*,[150] the Ninth Circuit specifically held that "pursuant to *Muehler v. Mena* . . . officers may constitutionally detain the occupants of a home during a parole or probation compliance search."[151] The Ninth Circuit determined that the extension of *Muehler* to these sorts of searches was appropriate because there was no reason to conclude that *Muehler* applied "only when the search is conducted pursuant to a search warrant but not to a probation or parole compliance check."[152] "To the contrary, *Muehler*'s underlying justifications permitting detentions during home searches apply with full force [to searches of a probationer's home], notwithstanding the absence of a search warrant."[153] "Just as in *Muehler*,

---

[147] *Id* at 102–103.

[148] *Id*. at 98 (Citing *Summers* 452 U.S. at 705.)

[149] *Id.*

[150] 574 F. 3d 1169 (9th Cir. 2009), reversed on other grounds by *United States v. King*, 687 F.3d 1189 (9th Cir. 2012).

[151] *Id.* at 1173.

[152] *Id.* at 1175.

[153] *Id.*

'the additional intrusion caused by detention is slight' while 'the justifications for detention are substantial.'"[154]

The Ninth Circuit's decision in *Sanchez* to extend *Muehler* to warrantless probation compliance searches is rational, and will be followed here. Mr. McGuire was informed by Detective Valdez that he was detained while an investigation was being conducted,[155] specifically for a probation compliance check.[156] This sort of detention was clearly justified by the recognized (and substantial) law enforcement justifications of preventing flight, minimizing the risk of harm to the officers, and facilitating the orderly completion of the search.[157] Indeed, under *Muehler* and *Sanchez,* Detective Valdez did not have to have a particular suspicion that Mr. McGuire was involved in criminal activity in order to detain him because the intrusion was slight and was offset by the need to complete the probation compliance search of Mr. Erickson's residence. Mr. McGuire was lawfully detained and his Fourth Amendment rights were not violated.

### 3. Defendant's Statements Cannot Be Suppressed Because the Search Was Reasonable Under the Fourth Amendment and Because Defendant Was Not Illegally Seized

In order to successfully suppress evidence, a defendant must establish an infringement of his Fourth Amendment rights.[158] Because the search and the detention at issue here did not violate Mr. McGuire's Fourth Amendment rights, Mr. McGuire's subsequent statements to law enforcement cannot be suppressed. Indeed, that Mr. McGuire clarified that he possessed the

---

[154] *Id.* (quoting *Muehler* 544 U.S. at 98).

[155] Transcript 87:13–14; 91:10–15.

[156] Transcript 139:15–17.

[157] *Summers*, 452 U.S. at 702–703.

[158] *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000).

firearm[159] and that he had been previously convicted of a felony[160] after a valid *Miranda* waiver[161] only bolsters this conclusion. The evidence will not be suppressed and the Motion is denied.

### ORDER

IT IS HEREBY ORDERED that Defendant's Motion to Suppress[162] is DENIED.

Signed October 16, 2018.

BY THE COURT

David Nuffer
United States District Judge

---

[159] Transcript 142:19–22.

[160] Transcript 131:15–16.

[161] Transcript 142:15–16; Government Exhibit 15.

[162] Defendant's Motion to Suppress, docket no. 15, filed June 11, 2018.